FILED' 10 OCT 20 08:28USDC-ORE

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

BOBBY J. GOURNEAU

        Plaintiff,

        v.

MICHAEL J. ASTRUE, Commissioner of Social Security,

        Defendant.

CV-09-538-AA

OPINION AND ORDER

AIKEN, Judge:

    Plaintiff Bobby Gourneau brings this action for judicial review of a final decision of the Commissioner of Social Security denying her application for supplemental security income (SSI) payments under Title XVI of the Social Security Act. The court has jurisdiction under 42 U.S.C. §§ 405(g), 1383(c)(3). The Commissioner's decision is affirmed.

## BACKGROUND

Gourneau was thirty-seven years old at the time of the administrative hearing. Admin. R. 675. She earned a graduate equivalency degree (GED). *Id.* Gourneau has worked as a food server, dancer, and stocker. *Id.* at 23, 715-717. She alleges disability due to depression, anxiety, chronic pain, fatigue, COPD, and eating and sleep disorders. Gourneau filed for disability on October 8, 2004 alleging disability due to depression and anxiety since August 15, 1988. Her application was denied initially and on reconsideration. A hearing was held before an Administrative Law Judge (ALJ) on April 30, 2007 with a supplemental hearing on October 17, 2007. The ALJ issued an opinion on November 1, 2007 finding Gourneau not disabled, which is the final decision of the Commissioner.

## DISABILITY ANALYSIS

The initial burden of proof rests upon the claimant to establish disability. *Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir. 1995). To meet this burden, a claimant must demonstrate an inability to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months. . . ." 42 U.S.C. § 1382c(a)(3)(A).

The Commissioner has established a sequential process of up to five steps for determining whether a person over the age of 18 is disabled within the meaning of the Act. 20 C.F.R. §416.920, *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). At step one, the Commissioner determines whether the claimant has engaged in any substantial gainful activity (SGA) since the alleged onset of disability. 20 C.F.R. §416.920(b). If the claimant has engaged in SGA, he is not disabled. *Id.* If the claimant has not engaged in SGA, the analysis proceeds. The Commissioner determines at step two whether

the claimant has a severe impairment. An impairment is severe if it significantly limits the claimant's ability to perform basic work activities. 20 C.F.R. §416.921. The burden to show a medically determinable severe impairment is on the claimant. *Bowen v. Yuckert*, 482 U.S. at 146. At step three, there is a conclusive presumption that the claimant is disabled if the Commissioner determines that the claimant's impairments meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Id.* at 141; 20 C.F.R. §416.920(d). The criteria for these listed impairments are enumerated in 20 C.F.R. pt. 404, subpt. P, app. 1. (Listing of Impairments).

If the adjudication proceeds beyond step three, the Commissioner must assess the claimant's residual functional capacity (RFC). The claimant's RFC is an assessment of the sustained work-related activities the claimant can still do on a regular and continuing basis, despite the limitations imposed by his impairments. 20 C.F.R. §416.945, Social Security Ruling (SSR) 96-8p. At step four, the Commissioner must determine whether the claimant retains the RFC to perform work he has done in the past. If the ALJ determines that he retains the ability to perform his past work, the Commissioner will find the claimant not disabled. 20 C.F.R. §416.920(f).

If the claimant cannot perform his past relevant work, the analysis proceeds to step five. At step five, the Commissioner must determine whether the claimant can perform work that exists in the national economy. *Bowen v. Yuckert*, 482 U.S. at 142; 20 C.F.R. §416.920(g). Here the burden of production shifts to the Commissioner to show that a significant number of jobs exist in the national economy that the claimant can do. *Tackett v. Apfel*, 180 F.3d 1094, 1099 (9th Cir. 1999). If the Commissioner meets this burden, then the claimant is not disabled. *Id.*, 20 C.F.R. §416.966.

## ALJ'S FINDINGS

The ALJ applied the five step disability determination analysis and found at step one that Gourneau had not engaged in any SGA since October 8, 2004, the protected filing date for her SSI application. Admin. R. 19. At step two, he determined that Gourneau has the medically severe impairments of "personality disorder NOS; major depression disorder, panic disorder without agoraphobia; polysubstance abuse disorder, in remission with reliance upon methadone therapy; and an eating disorder in remission." *Id.* The ALJ found at step three that Gourneau does not have an impairment or combination of impairments that meet or medically equal one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app.1. *Id.*

The ALJ found Gourneau has the RFC to:

> perform light work with the following mental limitations: mild limits on ability to make judgments on simple work-related decisions and to understand and remember complex instructions; moderate limits on carrying out complex instructions or to make judgments on complex work-related decisions; moderate limits on ability to interact appropriately with co-workers; mild restrictions on interacting appropriately with the public or supervisor; mildly limited on responding appropriately to usual work situations and to changes in a routine work setting.

*Id.* at 20.

At step four, the ALJ found Gourneau could perform her past relevant work as an unskilled stocker. *Id.* at 23. The ALJ solicited the testimony of a vocational expert (VE). The VE testified there were other jobs in the national economy an individual of Gourneau's age, education, past relevant work, and RFC could perform. *Id.* at 24, 719-720. Based on the VE's testimony the ALJ found there were significant jobs in the national economy that Gourneau could perform and was therefore not disabled. *Id.* at 25.

## STANDARD OF REVIEW

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. *Batson v. Commissioner of Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995).

The ALJ is responsible for "determining credibility, resolving conflicts in the medical testimony and resolving ambiguities." *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001). The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision. *Martinez v. Heckler*, 807 F.2d 771, 772 (9th Cir. 1986). If the evidence can reasonably support either affirming or reversing the Commissioner's conclusion, the court may not substitute its judgment for that of the Commissioner. *Batson v. Commissioner of Soc. Sec. Admin.*, 359 F.3d at 1193.

## DISCUSSION

Gourneau alleges the ALJ erred at step two of the disability analysis by discounting her physical impairments. She further alleges the ALJ erred by failing to further develop the record. Gourneau asserts the ALJ erred at step three by failing to determine her mental impairments met a listing. She challenges the ALJ's determination of her RFC by alleging the ALJ improperly assessed the medical evidence and her credibility. Gourneau also asserts the ALJ erred at steps four and five by not including all of her limitations in the hypothetical questions given the VE.

**I.      Medical Background**

Gourneau was seen by the Multnomah County Health Department (MCHD) in February 2002 for a possible infection following a tooth extraction and was given Vicodin for pain. Admin. R. 213-214. The following month Gourneau was requesting pain medications from the staff at MCHD and was provided information about detoxification programs and told the dentist must inform her physician regarding the need for narcotics. *Id.* at 208-209, 212. MCHD referred Gourneau back to CODA, a detoxification program, in order to wean her from narcotics. *Id.* at 205-206.

In May 2002 Gourneau began receiving services from Cascadia Mental Health Services (Cascadia). *Id.* at 247. A provider at Cascadia diagnosed her with major depressive disorder, recurrent, severe without psychotic features; panic disorder without agoraphobia; opioid dependence; cannabis dependence; alcohol dependence, sustained full remission; cocaine dependence, sustained full remission; rule out opioid-induced mood disorder with depressive features; rule out cannabis-induced anxiety disorder. *Id.* at 247-251. Gourneau continued receiving services from Cascadia through February 2007.

Gourneau was treated in the Kaiser medical system and had problems with an ear cyst in late 2002 that resulted in minor surgery in 2003 and was given Vicodin. *Id.* at 468-474, 482-488. She complained of knee pain in January 2003 and was referred to orthopedics. *Id.* at 482. Gourneau later complained of some stomach pain and was given pain medications. *Id.* 480-481. In February 2003 she complained of some pelvic pain and urinary problems and was given information. *Id.* at 476. Gourneau completed a disability report in August 2003 stating she was unable to work due to depression and anxiety. *Id.* at 88-97.

Notes from Gourneau's therapy sessions at Cascadia indicated in October 2003 that she had decreased panic and anxiety and that she was receiving treatment at CODA to get off of Vicodin. *Id.* at 229-230, 347. Dr. Thore from CODA examined Gourneau on January 15, 2004 and noted a trial detoxification program was unsuccessful in treating her several year addiction to prescription narcotics. *Id.* at 373-376. He further noted she had no medical problems other than psychiatric ones and her depression was being treated fairly well with medication. *Id.* at 374-375. Dr. Thore also noted Gourneau complained of a chronic knee problem with no etiology but stated the pain required narcotics. He diagnosed opiate dependence; past history of cocaine and alcohol addiction; past history of depression; rule out post traumatic stress disorder (PTSD). Dr. Thore noted Gourneau's attention-deficit disorder and anorexia may require medications and therapy and he prescribed a methadone program for detoxification. *Id.* at 376.

Gourneau was seen by Kaiser family nurse practitioner Fresch on February 11, 2004 complaining of right knee pain since the previous November. *Id.* at 465-466. Fresch noted that Gourneau did not mention any knee problems at her December visit, and complained of being treated badly for requesting Vicodin. Fresch noted the right knee was without redness, heat, swelling or masses; had pain-free range of motion; and had no popping, clicking or laxity.

Dr. Ugolini completed a psychodiagnostic evaluation of Gourneau on February 13, 2004. *Id.* at 294-305. She diagnosed major depressive disorder, recurrent, moderate in severity; panic disorder; opioid abuse in early partial remission by patient report, currently in a methadone maintenance program; cannabis abuse in early partial remission; alcohol dependence in full sustained remission; cocaine abuse in full sustained remission; rule out eating disorder. Dr.

Ugolini noted Gourneau described chronic right knee pain with no history of surgery to her back or knee.

A CT scan of Gourneau's lumbar spine taken on February 22, 2004 showed a mild bilateral neural foraminal narrowing and thirty percent central canal narrowing at L5-SI. *Id.* at 493. Dr. Ward of Kaiser examined Gourneau on February 25, 2004 for low back pain with sudden onset and improvement. *Id.* 459-464. He noted she reported pain, swelling and stiffness in her right knee, but she had an otherwise normal exam, and her back CT scan was not clinically significant. Dr. Ward diagnosed lumbrosacral strain and prescribed physical therapy, ice, and rest with improvement in six to eight weeks. He also prescribed short term pain medications. Dr. Ward ordered a knee x-ray due to her symptoms. The x-ray noted fairly good mineral content in the knee and showed no arthritic changes. *Id.* at 492.

FNP Fresch saw Gourneau on August 10, 2005 and she complained of diffuse pelvic pain. *Id.* at 457-459. She noted Gourneau was continuing on methadone, had stable depression, and was trying to improve her diet. FNP Fresch suggested a nicotine patch for her long standing smoking habit. A chest x-ray taken on August 10, 2005 indicated evidence of old granulomatous disease, chronic obstructive pulmonary disease (COPD). *Id.* at 491. Dr. Vessely examined Gourneau on August 30, 2005 and diagnosed subclinical hyperthyroidism with minimal symptoms. *Id.* at 455-457. This was noted to be resolved in October 2005. *Id.* at 551.

Gourneau was seen at Kaiser on January 31, 2006 for fatigue and it was noted she had a diagnosis of COPD but was still smoking; did not understand how to use her inhaler; was not eating much; not taking her vitamins; not taking her Ensure; and stopped taking her Zoloft. *Id.* at 545-547. Gourneau restarted her Zoloft and felt better and was stable on her methadone. Her

8 - OPINION AND ORDER

COPD was noted to be stable and she was given information on the need to quit smoking, and given a prescription for a medication to stop smoking that required enrollment in a tobacco cessation program. Gourneau was also noted to have anemia due to poor eating; and fatigue from anemia, anorexia, and depression. She was provided with nutritional information and smoking cessation information at various visits. *Id.* at 522-525, 543-546.

On July 18, 2006 Gourneau called Kaiser due to a lump on her left ovary that was giving her discomfort, but declined to go to urgent care. *Id.* at 540. Gourneau returned to Kaiser in September 2006 complaining of chronic fatigue and requesting a handicap sticker due to her COPD. *Id.* at 537-538. It was noted she continued to smoke, was anorexic but stated she was eating well; and smelled of cigarettes. On October 2, 2006 Nurse Chong administered a treadmill test. *Id.* at 533-534. The functional capacity was fair and noted to be consistent with a sedentary person. However, the test was nondiagnostic due to low maximum heart rate and exercise level obtained.

Dr. Vessely saw Gourneau on November 7, 2006 and noted she was still fatigued but tapering her methadone, and ordered new thyroid tests. *Id.* at 530-531. Dr. Vessely reviewed Gourneau's tests on November 10, 2006 and noted they were normal and her thyroid was not the cause of fatigue. *Id.* at 506. On November 17, 2006 Dr. Wyler noted resolution of an ovarian cyst and gave her Vicodin for discomfort and progesterone. *Id.* at 526-528. Gourneau was still on outpatient methadone maintenance at CODA on November 30, 2006. *Id.* at 561.

Dr. Starbird completed a psychodiagnostic report of Gourneau on June 26, 2007. *Id.* at 636-644. Dr. Starbird examined Gourneau, conducted MMPR-II testing and reviewed all previous examinations and therapy notes. Dr. Starbird found the MMPR-II invalid as it reflected

an over-reporting of psychopathology and clients with those scores are thought to be exaggerating symptoms. "The profile was consistent with people who are inpatients in psychiatric settings. The profile obtained by Ms. Gourneau was not consistent with her presentation in the interview, her psychiatric history or her self-report of symptoms. Therefore, it is deemed an invalid profile. . ." *Id.* at 639.

Dr. Starbird diagnosed major depressive disorder, recurrent, moderate; panic disorder without agoraphobia; alcohol dependence, in full sustained remission; cannabis dependence, in full sustained remission; narcotic pain medication dependence, in full sustained remission; methamphetamine abuse, in full sustained remission; features of PTSD; eating disorder NOS, in remission; personality disorder NOS, with borderline and histrionic traits. *Id.* at 641. She deemed Gourneau capable of handling funds. *Id.* Dr. Starbird completed a form on Gourneau's mental ability to do work-related activities. *Id.* at 642-643. She noted mild limits on the ability to make judgments on simple work-related decisions; to understand and remember complex instructions; interact appropriately with co-workers and supervisors; and respond appropriately to changes in a routine work setting. Dr. Starbird noted moderate limits on the ability to carry out complex instructions; make judgments on complex work-related decisions; and to interact appropriately with co-workers. She noted Gourneau's reliability as a worker would be affected by her mental health conditions. *Id.*

## II.    Step Two Determination

Gourneau argues that the ALJ improperly found COPD a nonsevere impairment and failed to address her back, knee and pelvic pain, anemia, fatigue, anorexia and insomnia. At step two, the Commissioner determines whether the claimant has a medically severe impairment or

10 - OPINION AND ORDER

combination of impairments that meets the twelve month duration requirement. An impairment is severe if it significantly limits the claimant's ability to perform basic work activities. 20 C.F.R. § 416.921. Gourneau bears the burden of proving that her impairments are severe. *Mayes v. Massanari*, 276 F.3d 453, 459 (9th Cir 2001), 20 C.F.R. § 416.912.

The medical record indicates that Gourneau complained of back pain in December 2003 and February 2004. Admin. R. 459-464, 467-468. She was prescribed ice, physical therapy, and rest with resolution expected in a month or two. Her CT scan of the spine was considered not clinically significant. *Id.* at 463. Gourneau alleges Dr. Ward diagnosed a back impairment, however, his treatment notes indicate no long term back impairment or surgery and that the pain was resolved. *Id.* at 463. Gourneau was not diagnosed with a back impairment and her symptoms did not continue for a twelve month period necessary for a finding of impairment.

Dr. Thore described Gourneau's knee pain as "chronic" but with no known etiology. *Id.* at 374. Gourneau complained of knee pain, however, there are no medical signs or laboratory findings to support the finding of an impairment. Her x-ray and most clinical exams were normal. *Id.* at 459-466, 492. Gourneau asserts diagnosis of a knee impairment by Drs. Ward, Ugolini, and Thore. Dr. Ward noted some swelling over the medial joint line with an otherwise normal exam. He ordered an x-ray and noted her symptoms of knee pain. *Id.* at 462-463. As noted, the x-ray was normal. *Id.* at 492. Dr. Ugolini is a psychologist who noted Gourneau's complaint of chronic knee pain. *Id.* at 295, 303 Dr. Thore noted Gourneau should follow up her bilateral knee pain. *Id.* at 376. None of these providers diagnosed an impairment, but rather noted symptoms. Symptoms are not sufficient to establish an impairment. Gourneau can only "establish an impairment if the record includes signs-the results of 'medically acceptable clinical

diagnostic techniques, such as tests.'" *Ukolov v. Barnhart,* 420 F.3d 1002, 1005 (9th Cir. 2005)(internal citations omitted).

The same is true of her other physical complaints. There is a reference to insomnia when sleeping with her youngest child, however, Gourneau's husband noted in early 2005 that she slept all the time. *Id.* at 155, 329. Gourneau's pelvic pain was transitory with a possible cyst that was noted to be "resolved." *Id.* at 526.

The ALJ noted Gourneau' eating disorder, which on occasion caused anemia, was in remission but included it as an impairment and included it in the functional analysis of limitations caused by impairments. *Id.* at 19-20. The ALJ noted some of Gourneau's fatigue was due to the large amounts of methadone she was taking and that she was reducing her intake. *Id.* at 23. The ALJ also noted Gourneau's COPD, but found that it was not a severe impairment. The medical record noted the COPD was mostly stable but Gourneau continued to smoke. *See, Bray v. Commissioner,* 554 F.3d 1219, 1229 (9th Cir. 2009)(claimant continuing to smoke is a relevant factor that belies the claim of a debilitating respiratory illness). The ALJ noted there were no functional limitations related to her COPD in the medical record. *Id.* at 19. Gourneau's treadmill test indicated consistency with a sedentary lifestyle, but was nondiagnostic. *Id.* at 533-535. Gourneau testified at the administrative hearing that she was physically able to work and reported no physical limitations on her disability reports. *Id.* at 88-97, 107-113, 134-138, 689-690.

The ALJ did not err at step two of the analysis but rather found Gourneau had a combination of impairments that were severe and proceeded to step three. The issue is whether he evaluated the functional limitations of her conditions properly for her RFC.

Gourneau also asserts the ALJ failed to develop the record regarding her physical impairments. Despite being represented by counsel she asserts her mental impairments placed a higher burden on the ALJ to fully develop the record. An ALJ's duty to further develop the record is triggered when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence. *Mayes v. Massanari*, 276 F.3d 453 at 459-460; *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001). The ALJ does have a heightened duty when a claimant is found to be disabled due to mental impairments and is unrepresented by counsel. *Higbee v. Sullivan*, 975 F.2d 558, 562 (9th Cir. 1992). The ALJ did develop the record regarding Gourneau's mental impairments by ordering another psychological examination. Regarding Gourneau's physical impairments, the record was more than adequate for the ALJ to evaluate, and he did so appropriately.

### III.   Step Three Determination

At step three of the decision-making process, the regulations apply a conclusive presumption that the claimant is disabled if the ALJ determines that the claimant's impairment is equivalent to "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Bowen v. Yuckert*, 482 U.S. at 141; 20 C.F.R. § 416.920(d). The criteria necessary to establish the presumptively disabling impairments are enumerated in the Listing of Impairments. The claimant has the burden of proving that his impairment satisfies or equals each criteria for a listed impairment based on medical evidence. *Sullivan v. Zebley*, 493 U.S. 521, 530-532 (1990), *Tackett v. Apfel*, 180 F.3d at 1100, 20 C.F.R. §§ 416.908, 416.925.

Gourneau cites 20 C.F.R. pt. 404, subpt. P, app.1, 12.00A and 12.04B for the assertion that she meets a Listing. The first citation refers to an introduction on mental disorders in the Listings. The second refers to part of the criteria necessary to demonstrate an affective disorder under the Listings. An assertion of "functional problems is not enough to establish disability at step three." *Tackett v. Apfel,* 180 F.3d at 1100. "Medical equivalence must be based on medical findings." *Id.,* 20 C.F.R. § 416.925.

The ALJ specifically found that Gourneau's mental impairments did not meet or equal the criteria for the Listings 12.04, 12.06, 12.08, and 12.09. The criteria under part B of these Listings requires two marked functional limitations in two of the following areas: daily living, social functioning, maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration. The ALJ noted the acceptable medical sources did not find marked impairments which are required to meet a Listing. *Id.* at 22-23. 20 C.F.R. § 416.913(a).

Gourneau cites other sources, specifically nonmedical counselors, group therapy leaders, and nurses to demonstrate the severity of her symptoms meet the Listing. The opinion of counselors and nurse practitioners are not considered medical sources who can provide evidence to establish an impairment. 20 C.F.R. § 416.913(a). They may be used, however, to show the severity of an impairment. 20 C.F.R. § 416.913(d). The ALJ noted Gourneau's most thorough and recent psychiatric evaluation indicated an exaggeration of symptoms and he noted this over reporting in the treatment notes of the nonmedical sources. *Id.* at 23. The ALJ gave less evidentiary weight to these sources as some of the nonmedical sources used check off forms, had

limited treatment relationships and their opinions were contradicted by acceptable medical sources. *Id.* 22-23.

An ALJ may reject the opinion of a treating physician if it is controverted by other treating or examining physicians if the ALJ makes "findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record." *Thomas v. Barnhart,* 278 F3d 947, 957 (9th Cir 2002) (citations omitted). The ALJ may reject physician opinions, whether or not controverted, when they are brief, conclusory, and not supported by the record as a whole or clinical findings. *Thomas v. Barnhart,* 278 F.3d 947, 957, (9th Cir. 2002), *See, Batson v. Commissioner of Soc. Sec. Admin.,* 359 F. 3d at 1195. Another reason for rejecting physician opinions are when they rely primarily on a claimant's subjective complaints which are properly discounted. *Fair v. Bowen,* 885 F.2d 597, 605 (9th Cir. 1989). The ALJ can certainly give less weight to the opinions of counselors and nurse practitioners when they suffer from these same deficiencies. The ALJ did not err at step three and correctly found that Gourneau's impairments did not meet a Listing.

## IV. RFC

Gourneau asserts the ALJ erred in determining her RFC by failing to properly assess the medical evidence and evidence of her treatment providers. She also contends the ALJ erred in discounting her credibility.

### A. Medical Evidence

The ALJ limited Gourneau to a modified light level of work based on her symptoms, medical evidence, and other evidence as required by 20 C.F.R. § 416.929. Admin. R. 20, 21. Gourneau does not assert any further physical limitations that should have been included in the

RFC. She stated in her disability reports that she vacuums, picks up after her eight children, sweeps, mops, and does laundry. *Id.* at 107-113. As noted above, Gourneau testified she was physically able to work. *Id.* at 689. She reiterates the medical evidence noted in step two but does not assert any further functional limitations that should have been included in her RFC. The ALJ did not err in assigning her to a light level of work.

Gourneau asserts she has marked limitations in her mental functioning and these were not included in her RFC. As noted above, the marked limitations were listed primarily in check off forms and a letter by nonmedical sources. The ALJ ordered a new psychodiagnostic evaluation of Gourneau. Dr. Starbird conducted that exam and the ALJ it great weight. The RFC reflects the limitations included in that report. The ALJ noted this opinion is supported by the opinions of the nonexamining psychologists, Drs. Hennings and Rethinger. *Id.* at 22. The ALJ further noted the slight differences in these medical opinions were easily attributable to the time gap and the progress Gourneau has made from treatment. *Id.* Although Drs. Hennings and Rethinger noted more moderate limitations, both found Gourneau capable of carrying out short, simple instructions, having casual co-worker contact and normal supervision. *Id.* at 382-397, 420-437.

Social security regulations specify that the most weight is given to the opinions of treating physicians, followed by examining physicians, and the least amount of weight is given to nonexamining experts. *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001). The ALJ relied on the opinions of examining and nonexamining medical sources. Gourneau asserts he should have given great weight to the nonmedical treatment providers. The ALJ discussed each of the treatment providers and noted the limitations of check-off forms, letters, and limited relationships. In addition, the ALJ noted the treatment notes from these providers reflect "the

same over reporting of psychopathology psychologist Dr. Starbird observed. One also sees examples throughout the treatment records of the claimant's ability to function and the effectiveness of prescribed medication in limiting her symptoms." Admin. R. at 23. The ALJ did not err by giving greater weight to the opinions of medical sources regarding Gourneau's mental limitations.

### B. Credibility

Gourneau asserts the ALJ improperly rejected her credibility regarding the severity of her symptoms. and impairments. The ALJ must assess the credibility of the claimant regarding the severity of symptoms only if the claimant produces objective medical evidence of an underlying impairment that could reasonably be expected to produce the symptoms. *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996). Gourneau has medically determinable impairments which could produce her symptoms. When there is an underlying impairment and no evidence of malingering, An ALJ must provide clear and convincing reasons for discrediting a claimant's testimony regarding the severity of his symptoms. *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993). The ALJ must make findings that are "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995).

When making a credibility evaluation, the ALJ may consider objective medical evidence and the claimant's treatment history as well as any unexplained failure to seek treatment or follow a prescribed course of treatment. *Smolen v. Chater*, 80 F.3d at 1284-1285. The ALJ found Gourneau's mental impairments limited her functioning capacity and could reasonably result in symptoms. Admin. R. 22. However, the ALJ found the extent of the limitations claimed by

Gourneau not to be consistent with the medical record or the record as a whole. *Id.* at 21-23. He found the record showed impairments but not of a severity that would preclude all work. *Id.* at 23.

The ALJ may also employ ordinary techniques of credibility evaluation, such as the "claimant's reputation for lying, prior inconsistent statements concerning the symptoms and other statements by the claimant that appear to be less than candid." *Smolen v. Chater*, 80 F.3d at 1284, SSR 96-7p. The ALJ noted Gourneau was intentionally exaggerating her psychiatric symptoms. Admin. R. 21. He cited the opinion of Dr. Starbird, an examining psychologist, that Gourneau over reported her symptoms. *Id.* at 22-23. Exaggeration is a legitimate factor to consider in the disability analysis. *Tonapetyan v. Halter*, 242 F.3d at 1148. The ALJ also noted that during the hearing Gourneau said she was having a panic attack because of being downtown, yet proceeded to testify calmly and easily. Admin. R. 22.

The ALJ may also consider the claimant's daily activities, work record and the observations of physicians and third parties in a position to have personal knowledge about the claimant's functional limitations. *Thomas v. Barnhart*, 278 F.3d at 959. The ALJ found the level of daily activities reported by Gourneau was inconsistent with an inability to do any work. The ALJ noted Gourneau cared for eight children, remained in a long term relationship, and shopped. Admin. R. 22.

The ALJ considered the medical record, Gourneau's exaggeration of symptoms, and her daily activities and concluded the allegations of Gourneau regarding the limiting effects of her symptoms were not supported. The ALJ considered appropriate factors and drew reasonable inferences from substantial evidence in the record in assessing Gourneau's credibility.

18 - OPINION AND ORDER

The ALJ properly assessed Gourneau's RFC. He evaluated the medical evidence and reached conclusions based on substantial evidence in the record. The ALJ assessed credibility and drew reasonable inferences regarding credibility. The ALJ's determination of Gourneau's RFC is supported by substantial evidence in the record and free of legal error. The court must uphold the ALJ's findings, even if evidence exists to support more than one rational interpretation of the evidence. *Batson v. Commissioner of Soc. Sec. Admin.*, 359 F.3d at 1193; *Andrews v. Shalala*, 53 F.3d at 1039-1040. The ALJ's RFC decision is therefore upheld.

## IV.   Steps Four and Five

Gourneau asserts the ALJ erred at steps four and five of the sequential process by failing to consider all of her limitations in his questions to the vocational expert. At step four, the ALJ must determine if Gourneau can perform any past relevant work. At the administrative hearing, the ALJ elicited the testimony of a vocational expert ("VE"). Admin. R. 715-723. The VE testified that with the functional limitations included in the RFC, Gourneau could perform her past relevant unskilled work as she performed it. *Id.* at 718-719.

The ALJ proceeded to step five and asked the VE if there were other jobs in the national economy that a person of Gourneau's age, education and prior work history could perform. At step five, the Commissioner must show that significant numbers of jobs exist which the claimant can perform. *Andrews v. Shalala*, 53 F.3d at 1043. An ALJ can satisfy this burden by eliciting the testimony of a VE with a hypothetical question that sets forth all the limitations of the claimant supported by the record. *Id.*; *Osenbrock v. Apfel*, 240 F.3d 1157 at 1163.

Gourneau asserts the ALJ erred at steps four and five because he elicited testimony from the VE with hypothetical questions that did not contain all her limitations. The ALJ gave the VE

the mental functioning form completed by Dr. Starbird that contains mild and moderate mental limitations and is incorporated in her RFC. Gourneau asserts that the RFC does not contain the limitations described by her counselors, her physical complaints and that the ALJ did not give all of Dr. Starbird's report to the VE. However, as noted above, the RFC is supported by substantial evidence and free of legal error. An ALJ is not required to incorporate limitations based on evidence that he properly discounted. *Osenbrock v. Apfel*, 240 F.3d at 1163-1165.

The ALJ considered all the evidence and framed his vocational hypothetical questions based on the limitations supported by the record as a whole. The VE testified that Gourneau could perform a significant number of jobs that exist in the national economy. The ALJ's conclusion that Gourneau is able to perform some work and is not disabled is supported by substantial evidence and free of legal error.

## CONCLUSION

Based on the foregoing, the ALJ's decision that Gourneau does not suffer from a disability within the meaning of the Social Security Act is based on correct legal standards and supported by substantial evidence. The Commissioner's final decision is AFFIRMED and the case is DISMISSED.

DATED this *19* day of *October*, 2010.

*Ann Aiken*

Ann Aiken

United States District Judge